WALTER J. ROTHSCHILD, Judge.
12Defendant, Craig J. Lirette, was charged by bill of information with two counts of indecent behavior with a juvenile in violation of LSA-R.S. 14:81 and he pled not guilty. Following a jury trial, he was found guilty of the lesser verdict of attempted indecent behavior with a juvenile under the age of 13 for count one, which involved K.F., and guilty as charged of indecent behavior with a juvenile under the age of 13 for count two, which involved J.T.[1] Defendant filed a motion for new trial, which was denied. He was sentenced to one year imprisonment at hard labor without benefit of parole, probation, or suspension of sentence for count one and two years imprisonment at hard labor without benefit of parole, probation, |sor suspension of sentence for count two. These sentences were ordered to run consecutively with each other. This appeal follows.

FACTS

On February 18, 2010, defendant contacted the police department, and the call was transferred to Deputy Robert Swan-cey, who at the time was employed by the Harahan Police Department. Defendant advised that there had been some allegations made against him about molestation of children and he wanted to know what he needed to do. At that time, Deputy Swan-cey had not received any reports concerning this. However, he then received notice that Judy Taffaro had called, and there was a report in which Ms. Taffaro said that she learned of allegations made by her nieces, K.F. and F.F. Deputy Swan-cey spoke with Ms. Taffaro on the phone and she advised him of what her nieces had told her. She also told him about another juvenile, J.T., who was making allegations against defendant. Based on what he learned from Ms. Taffaro, Deputy Swancey scheduled an appointment with the Children’s Advocacy Center. Deputy Swancey contacted J.T. by phone, and she was also referred to the Children’s Advocacy Center.
On February 19, 2010, Staci Lanza, an employee of the Children’s Advocacy Center, interviewed K.F., F.F. and J.T. The interviews were recorded on tape, and then played during trial.[2] Deputy Swan-cey monitored the interviews at the center. He testified that the statements were consistent with the information that he had received, so he obtained arrest warrants for defendant and for K.K. was the mother of K.F. and F.F., and defendant was her boyfriend.[3]
Deputy Swancey went to 1009 Colonial Club Drive in Harahan and arrested K. a few days later, on February 23, 2010. While in the residence, Deputy |4Swancey conducted a “security sweep” and K. pointed out her room and KF.’s room. He noticed that KF.’s room had a small child’s bed, large enough for one person. He noticed that KF.’s room was right across the hall from K’s room.
K.F. testified that she was 12 years old and her birthdate was December 28, 1998. *805 She explained that she lived with her father, but before she had lived in Harahan with her mom, F.F., and C.J. K.F. said that her bedroom was by her mother’s bedroom. She also said that the bed in her room was for one person. She explained that she heard someone in her room and a banging on the walls. She then saw C.J. on the side of her bed. She testified that C.J. was naked and got into her bed. She said that when he got into the bed with her the “side of him” touched her. She explained that they were both under the “covers.” K.F. said she screamed and ran out. According to K.F., C.J. said “hey baby where you’re going?” She said this incident happened at about 1:00 or 2:00 a.m. She explained that she was scared, grabbed the phone, and waited for about 20 minutes. She said she then went to her mother’s bedroom to tell her what had happened. Her mother told her to grab a pillow and sleep on the sofa. K.F. explained that she grabbed the phone and a flashlight because she was scared. She went to sleep on the sofa, and decided that she would call 9-1-1 if C.J. came back. K.F. said she was sure that it was her mother’s boyfriend, C.J. She identified defendant in court as C.J. She testified that she was familiar with him because he slept over almost every night.[4]
When questioned about when the incident took place, K.F. believed it was a Saturday night during the school year during November. She believed it was after Halloween and before Thanksgiving. She explained that F.F. was not at home and thought that she was at a friend’s house at the time. She told her aunt about the incident a few months later, around Mardi Gras.
IfiF.F.[5] testified that K.F. was her younger sister and that J.T. was a good friend of hers. She explained that Craig Lirette[6] was the boyfriend of her mother, K., and that her father was F. Her parents were going through a divorce, and she spent every other weekend with her father. She said that while she lived on Colonial Club Drive in Harahan, Craig slept over a lot. She described KF.’s room as being a few feet from her mother’s room. She testified that she had an aunt named Judy, and that Judy was her father’s sister. F.F. explained an incident involving her mother’s boyfriend and her friend J.T. She testified that she was sleeping in the living room on a sofa and J.T. was sleeping with her, but on a different sofa. She said that J.T. woke her up at about 6:00 or 6:30 a.m. When she awoke, she observed C.J. running out of the living room, screaming to “be cool, be cool.” She also heard him say not to tell, and that it was a mistake. She said that J.T. was about to cry and so they went to her bedroom. J.T. told her that C.J. had sat next to her and put his hand down her pants. She said J.T. was sad and wanted to call the police, but she did not let her. F.F. explained that she did not want to believe that it had happened. She did not see C.J. touch J.T.[7]
F.F. testified that she woke her mother up that afternoon to tell her about what had happened. J.T. told F.F.’s mother about what happened, but her mother said it was a mistake and not to tell anyone because F.F. and J.T. might not be allowed to be friends anymore.
*806 F.F. believed that this happened during their Christmas break from school. She recalled that her half-sister Amanda and her husband were there that night, and remembered going to a Christmas play for their church that same day. K.F. was in the play. However, she testified that she did not know the precise date that this | (¡happened. F.F. testified that she talked to her Aunt Judy about the incident a few months later, around Mardi Gras. She believed it had happened about two months prior to this.
J.T. also testified at trial.[8] She testified about an incident she said happened at her friend F.F.’s house at approximately 6:30 a.m., when she was sleeping on the sofa. She said she woke up to someone moving her legs and sitting down by her. The person started to rub her leg. She testified that she turned her head and saw that it was C.J. She said that C.J. started to squeeze her “butt a little.” She said he then touched her vagina. J.T. stated that she turned and said “[wjhat the hell. What are you doing?” She testified that C.J. started to stutter, not knowing what to say. J.T. said she got off of the sofa and ran to F.F., who was sleeping on a sofa next to her. She said that C.J. left the room.[9] J.T. said she told F.F. what happened after they went to F.F.’s bedroom and that she wanted to call the police, but F.F. was shocked and did not let her. According to J.T., F.F. told her mother, K., what happened and she told them not to worry about it because if they told anyone then they would not be able to be friends anymore. She believed that F.F. went to talk with her mother at around 5:00 p.m. about the incident while she was doing laundry. J.T. said that she also told K. what had happened.
J.T. recalled that Amanda and Brad were also at the house that morning, and believed it was during the Christmas holidays, recalling that they went to a play that K.F. was in at church at about 6:00 p.m.
When asked if she saw C.J. in court, F.F. said, “I don’t know.” Also, J.T. testified that she did not remember what C.J. looked like.
Judy Taffaro, a retired police officer and the aunt of F.F. and K.F., testified that at about noon on Mardi Gras Day, February 16, 2010, her sister-in-law, K, |7called and asked if she could bring K.F. to her house because K.F. did not want to go to the parades with K. and C.J. K.F. went to her aunt’s house and explained to her that she wanted to go to her house because her mother and C.J. were drinking and knew they would get “real drunk.”[10] K.F. told her that F.F. was alone at their home, so the aunt called F.F. and told her to call if she needed something and they would go get her. Ms. Taffaro testified that after a couple of hours F.F. called and she was crying. According to Ms. Taffaro, F.F. was upset so she told F.F. that her husband, F.F.’s uncle, would come by and get her. F.F. went to her aunt’s house and told her that she had seen a man in the window at her house and he was staring at her. She heard books fall off of a shelf, and she was scared.
Ms. Taffaro testified that they were baking cookies in her kitchen and K.F. said that she had to talk to her about something. K.F. told her that months before in November, around Thanksgiving, she was *807 sleeping in her bedroom and she woke up to C.J. in her bed. She said C.J. was naked and fondled her. She said he was touching her everywhere and so she screamed and jumped out of the bed. She told her aunt that she ran into her mother’s room and told her about what happened. K.F. told her aunt that her mother said to forget about it and to go sleep on the sofa. She told her aunt she did not tell F.F. because she was sleeping at J.T.’s house at the time. She testified that then F.F. told her about an incident involving her friend J.T. when she slept at her house around Christmas time in December. Ms. Taffaro believed the incident with J.T. happened on Sunday, December 20, 2009, which was the day of the Christmas play at the church. The play was at 6:00 p.m.
According to Ms. Taffaro, F.F. told her that she and J.T. were sleeping on an L-shaped sofa because there had been a party. She told her that around 6:00 a.m. |sshe heard J.T. screaming. F.F. saw C.J. running away and saying to “be cool”. F.F. said J.T. told her that C.J. had touched her vagina and other places. Ms. Taffaro called her brother, who was out of town, and told him to come home. Her brother reported this to the Harahan Police Department.
Dr. Jamie Jackson, an expert in the field of forensic pediatrics, testified that with children most of the time there was a delay in presentation for alleged abuse or sexual assault. She testified that generally reporting was not within 72 hours, and explained several factors contributing to the delay. At the time of the incidents, J.T. was 12 years old and K.F. was 10 years old.
F., who was the father of F.F. and K.F., testified that he and K, their mother, were divorced. F. testified that he had visitation with his children every other weekend and on certain week nights, plus other times. He testified that he did not know the dates that the children were with him.
Defendant presented testimony of witnesses who believed he had a good reputation. These witnesses were Officer Bobby P. Cañedo, Mitch Demuth, Cheryl Burges Lirette, and Tiffany Roth. Defendant also presented evidence as to his whereabouts at certain times in November of 2009 as well as in December of 2009. Alan Kirk-field testified that he was hunting in Mississippi with defendant from November 6, 2009, until November 8, 2009. Ricky Brooks, a friend of defendant’s, testified that in November 2009 he went hunting with defendant every weekend and that defendant was hunting in Mississippi for Thanksgiving as well.
Brad Oustalet, who is married to Amanda and is K.’s son-in-law, testified that he did not sleep at K.’s house in November or December of 2009. He said that the only time he did sleep there was after the Saints and Cardinals game in January of 2010.
^Bridget Wilson, defendant’s daughter, testified that her father was living at her house on Saturday, December 19, 2009. She testified that her father came home that night at about 11:00 or 12:00 and then went to bed. She said that she woke her father up that next morning for their family Christmas party at her uncle’s house in Metairie. They arrived at the party at around noon. Her husband, Audie Wilson, also testified that defendant was living ■with them in December of 2009. He testified that on December 19, 2009, he went to the Saints game and returned home that night at approximately 10:30. He said he did not see defendant, and went to sleep. However, he testified that defendant slept at their house that night and he woke defendant up the next morning at around 8:30 or 9:00 a.m. to go to the Lirette Christmas Party. Wayne Penton was at *808 Bridget and Audie Wilson’s house on December 19th and testified that he was there when defendant returned home a little after 11:00 p.m.
Defendant testified that he was 52 years old. He explained that he owned property in Mississippi and hunted. He testified that he met K. on July 18, 2009, and that they started dating about a month later. He explained that K. was separated from her husband at the time. He testified that he spent some nights at K.’s house at 1009 Colonial Club Drive, mostly during the week because he was at his property on the weekends. He said that every weekend in November of 2009, he and Ricky Brooks were at his property in Mississippi. Defendant presented receipts to support the time he said he spent in Mississippi in November of 2009. Defendant testified that K. went to the property from November 20th to November 30th. He also presented receipts to support the time he said he spent in Mississippi in December of 2009. Defendant testified that he slept at his daughter’s house on December 19, 2009, and went to bed about 12:30 or 1:00 a.m. He testified that he woke up the next day at approximately 9:30 a.m. He then went to his brother’s |10house for a Christmas party. Later, he went to a play for K.F. at the church.
Defendant said that he did sleep at K.’s house after the Saints and Cardinals game on January 16, 2010. He said that Amanda and Brad were there that night and that there was a party. He denied doing anything on this night as well. He also said he stayed at K.’s house two or three nights a week.
Defendant said that he heard KF.’s testimony about him going into her bedroom in November of 2009 while he was naked and attempted to get into bed with her. Defendant denied doing this. He also testified that he heard the allegations regarding J.T. He denied committing the act she described and said he never touched her. He said he did not spend the night at K.’s the night J.T. said the incident took place. Defendant testified that the incidents that K.F. and J.T. described never happened.
Defendant said he and K. were still dating at the time of trial. He also testified that the children called him C.J.

ASSIGNMENTS OF ERROR

By this appeal, defendant challenges the sufficiency of the evidence presented by the State.[11] He contends that he presented alibi evidence through testimony and receipts that eliminated the possibility that he would have been able to commit the offenses. Defendant further argues that he presented evidence that he had good, moral character. He attacks the credibility of J.T., arguing that she could not identify him, that she remembered things at trial that were not included in her prior statement, and that F.F. saw nothing. He further argues that the State failed to prove a crime with K.F. He argues that there was no lewd act in K.F.’s | n presence, and that even if he did get into the bed naked it was not a lewd or lascivious act, noting that there was no genital contact and it did not happen multiple *809 times. Defendant also claims that the State failed to show that he had the specific intent to gratify himself or the victims. Defendant concludes that he demonstrated the impossibility of the acts, but that even if the acts took place they did not constitute a violation of the statute.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See State v. Ortiz, 96-1609, p. 12 (La.10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998); State v. Bailey, 04-85, p. 4 (La.App. 5 Cir. 5/26/04), 875 So.2d 949, 954-55, writ denied, 04-1605 (La.11/15/04), 887 So.2d 476, cert. denied, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005) (quotation omitted). Both the direct and circumstantial evidence must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. State v. Harrell, 01-841, p. 7 (La.App. 5 Cir. 2/26/02), 811 So.2d 1015, 1019. A reviewing court is required to consider the whole record and determine whether a rational trier of fact could have found the State proved the essential elements of the crime beyond a reasonable doubt. State v. Price, 00-1883, p. 5 (La.App. 5 Cir. 7/30/01), 792 So.2d 180, 184.
“Circumstantial evidence is evidence of facts or circumstances from which one might infer or conclude, according to reason and common experience, the existence of other connected facts.” State v. Kempton, 01-572, p. 6 (La.App. 5 Cir. 12/12/01), 806 So.2d 718, 722. “The rule as to circumstantial evidence is: | ^assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” LSA-R.S. 15:438. The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. State v. Mitchell, 99-3342, p. 7 (La.10/17/00), 772 So.2d 78, 83.
Defendant was convicted of attempted indecent behavior with a juvenile (K.F.) and indecent behavior with a juvenile (J.T.). LSA-R.S. 14:81 provides, in pertinent part, the following:
A. Indecent behavior with juveniles is the commission of any of the following acts with the intention of arousing or gratifying the sexual desires of either person:
(1) Any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons. Lack of knowledge of the child’s age shall not be a defense;
LSA-R.S. 14:81.[12]
Accordingly, to convict a defendant of indecent behavior with a juvenile under LSA-R.S. 14:81, the State must prove that (1) there was an age difference of greater than two years between the accused and the victim, who was not yet seventeen; (2) the accused committed a *810 lewd or lascivious act upon the person or in the presence of a child; and (3) that the accused intended to arouse or gratify either his own or the victim’s sexual desires. State v. Battaglia, 03-692, p. 6 (La.App. 5 Cir. 11/25/03), 861 So.2d 704, 708, writ denied, 04-1701 (La.4/29/05) 901 So.2d 1058. Specific intent need not be proven as a fact, but may be inferred from the circumstances and actions of the defendant. Battaglia, supra.
Defendant was also convicted of the lesser and included offense of attempted indecent behavior with a juvenile. Louisiana’s attempt statute provides the following:
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
LSA-R.S. 14:27.
Accordingly, the State was required to prove beyond a reasonable doubt that defendant specifically intended to commit a lewd and lascivious act upon the victim, or in the victim’s presence, and did an act in furtherance thereof. See State v. Gaspard, 02-1040, p. 3 (La.App. 3 Cir. 3/5/03), 841 So.2d 1021, 1024.
“A lewd or lascivious act is one which tends to excite lust and to deprave the morals with respect to sexual relations and which is obscene, indecent, and related to sexual impurity or incontinence carried on in a wanton manner.” State v. Stec, 99-633, p. 6 (La.App. 5 Cir. 11/30/99), 749 So.2d 784, 787. In State v. Interiano, 03-1760, pp. 7-8 (La.2/13/04), 868 So.2d 9, 15, the Louisiana Supreme Court reaffirmed this definition of “lewd and lascivious” for purposes of LSA-R.S. 14:81(A). The Supreme Court further noted the Reporter’s Comments to LSA-R.S. 14:81 (A) stated lewd and lascivious “encompasses not only the physical touching of the victim in an indecent manner, but also ‘indecent sexual displays in the presence of children under the age of seventeen.’ ” Id. at 15. The Supreme Court stated that it is not necessarily the act in and of itself that has to be lewd and lascivious. It explained that the statute gives notice “that a person knowingly engaged in any overt sexual activity performed in the physical proximity of a child 114enters a zone of danger in which he runs the risk that a trier of fact may later find that activity criminal in nature.” Id. at 15. In determining whether an act is lewd or lascivious, one must consider the time, the place, and all of the circumstances surrounding its commission, including the actual or implied intention of the actor. State v. Sturdivant, 27,680, p. 6 (La.App. 2 Cir. 2/28/96), 669 So.2d 654, 659.
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’ testimony, if believed by the trier-of-fact, is sufficient support for a requisite factual conclusion. State v. Turner, 05-75, pp. 11-12 (La.App. 5 Cir. 5/31/05), 904 So.2d 816, 823, writ denied, 05-2591 (La.5/26/06), 930 So.2d 20. The victim’s testimony alone can be sufficient to establish the elements of a sexual offense, even if the State does not introduce medical, scientific or physical evidence to prove the commission of the offense. State v. Hotoph, 99-243, p. 13 (La.App. 5 Cir. 11/10/99), 750 So.2d 1036, 1045, writs denied, 99-3477 (La.6/30/00), 765 So.2d 1062, and 00-0150 (La.6/30/00), 765 So.2d 1066.
Defendant argues that because he presented evidence of his whereabouts for the dates that the incidents are alleged to *811 have taken place, the State failed to produce sufficient evidence. However, the date and time of the offenses are not essential elements of the offense of indecent behavior with a juvenile. See State v. Lyles, 03-141, p. 7 (La.App. 5 Cir. 9/16/03), 858 So.2d 35, 44; State v. Mickens, 31,737, pp. 9-10 (La.App. 2 Cir. 3/31/99), 731 So.2d 463, 469, writ denied, 99-1078 (La.9/24/99), 747 So.2d 1118. Although defendant suggests that he cannot be found guilty beyond a reasonable doubt because of the problems with the dates, the State was not required to prove the dates as essential elements of the crime. The jury could have believed the witnesses that the offenses did take place, even if the children were mistaken on the timing of the incidents. The incidents were not | ^reported to the police until months after the children said the incidents had taken place. Although the children testified that they made K. aware of the incidents promptly after their occurrence, it was not until K.F. and F.F. told their aunt of the incidents that the investigation into the incidents commenced.
K.F. and J.T. testified regarding the incidents they said happened to them. Defendant denied that the incidents ever happened, offering support of his whereabouts at the times the incidents were said to have occurred. However, the credibility of witnesses presenting conflicting testimony on factual matters is within the sound discretion of the trier of fact. State v. Jones, 08-20, p. 7 (La.App. 5 Cir. 4/15/08), 985 So.2d 234, 240. The trier of fact shall evaluate the witnesses’ credibility, and when faced with a conflict in testimony, is free to accept or reject, in whole or in part, the testimony of any witness. Id. It is not the function of the appellate court to second-guess the credibility of witnesses as determined by the trier of fact or to reweigh the evidence absent impingement on the fundamental due process of law. Id. The jury could have justified the conflicting evidence in several manners. For instance, the jury could have believed the victims and disbelieved defendant and his witnesses. The jury could have believed what the victims said happened actually happened, but on different dates than alleged, recognizing the time that had passed before the investigations began into the incidents and further understanding that these were children trying to pinpoint specific dates. Regardless, the dates were not essential elements to the crime, and the jury obviously believed that the incidents did happen, at some point.
Further, even if there were some inconsistencies in the testimony presented by the State, the inconsistencies are one of any number of factors the jury weighs in determining whether or not to believe a witness’ trial testimony. Hotoph, 99-243 at 13, 750 So.2d at 1045 (quotation omitted).
|1fiOur review of the record shows that the State presented sufficient evidence of the crimes for which defendant was convicted. The State demonstrated that defendant was over the age of 17 and more than 2 years older than the victims, who were not yet 17. The State presented the birth certificates of the juvenile victims involved in this case. J.T.’s birthdate was February 13, 1997. KF.’s birthdate was December 28, 1998. The State proved that both K.F. and J.T. were under the age of 13 and at least two years younger than defendant, who testified that he was 52 years old at the time of trial.
As for the incident involving J.T., the State presented evidence that defendant committed a lewd act upon her and the circumstances surrounding the incident suggest that defendant had the requisite intent to arouse or gratify himself. The State presented evidence through the vie- *812 tim’s testimony that defendant woke her up when he was moving her legs, rubbed her leg, squeezed her “butt,” and touched her vagina. Although F.F. did not observe the touching, she did confirm that J.T. screamed and she did observe defendant leaving the room, saying to “be cool,” not to say anything, and that it was a mistake. F.F. saw how upset J.T. was and how defendant acted after the incident described by J.T.
As for K.F., the State presented evidence through the victim’s testimony that defendant came into her bedroom in the early morning hours and was naked. She testified that he got into bed with her, while he was naked, and got under the “covers.” She said the “side of him” touched her. She screamed and ran out of the room, and defendant asked where she was going. Based on this testimony, we find that defendant had the specific intent to commit the offense and took several steps in furtherance of committing the offense by taking his clothes off, going to KF.’s bedroom, climbing into K.F.’s bed, and getting under the “covers” with her in her small bed. The jury could have also believed that his inquiry as to where she was |17going showed his intent to get her to remain in the bed with him and supports the proposition that defendant planned further action. We find that it is only because K.F. got out of her bed and ran off that defendant’s intentions were not completed. The jury could have believed, in finding the lesser verdict of attempted indecent behavior with a juvenile, that more was intended, and that it was K.F. who prevented fulfillment of the act defendant intended to accomplish with this juvenile.
In State ex rel. W.B., 08-1458, p. 3 (La.App. 4 Cir. 4/22/09), 11 So.3d 60, 62, writ denied, 09-1129 (La.1/22/10), 25 So.3d 139, the juvenile court judge found that W.B.’s disrobing in a 13-year-old’s bedroom and waiting for her to return to the room rose to the level of a lewd or lascivious act in the presence of a child. The Court held that based on the fact that no evidence was presented to refute the testimony given at trial, it could not find that the juvenile court judge was clearly wrong in his finding that W.B. was guilty of indecent behavior with a juvenile.
In the present case, the jury also had the benefit of hearing both victims testify as to the incidents that happened to them. The jury heard the juvenile victims both testify that they were awakened by defendant in the morning hours at K.’s house. We find that this offered credibility to the victims and lessened defendant’s chances of the jury believing that a mistake was committed, instead of an intentional act.
Finally, defendant suggests that J.T. was not credible because she could not identify defendant in court as the perpetrator. However, J.T. did testify that it was C.J. that did this to her and F.F. said she saw C.J. leaving the living room immediately after J.T. screamed. Defendant admitted on cross-examination that the children called him C.J. K.F. and F.F.’s aunt, as well as K.F., identified 1 isdefendant in court as C.J. The jury could have decided that the victims’ testimonies alone were sufficient under the circumstances of this case.
Based on the foregoing, we find that any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt and that the evidence presented is sufficient to support defendant’s conviction.
Defendant next challenges the admissibility ruling of the trial court regarding the tape recorded conversation between K. and F. that defendant sought to use as impeachment evidence during F.’s *813 testimony when he denied that he told K. that F.F. and J.T. should not be associated with each other. Defendant suggests that he was not allowed to present his defense because the tape was ruled inadmissible. Defendant contends that the evidence would have been of paramount importance because F. thought J.T. was a bad influence on his daughter when the State’s theory was that the alleged victims were truthful in their allegations. Defendant believed this was important for purposes of credibility of the State witnesses, J.T. and F.F. Defendant contends that he was denied the ability to attack the credibility of his accusers.
The defense called F., the father of K.F. and F.F., to testify. He was questioned about a discussion he had with K. about severing ties between J.T. and F.F. F. denied ever saying that F.F. should not hang around with J.T. A bench conference was then held, and defense counsel advised the judge that he had an audio tape of F. and K. talking and it reflected that F. said he wanted to cut ties between F.F. and J.T. The defense wanted to use the tape as impeachment evidence. The State argued that this was a back-door character attack on J.T. The court suggested that the defense complete its examination of F. and then they would listen to the tape. Defense counsel then explained that K. had recorded the phone conversation regarding J.T. and that it was a conversation from July of |in2009. The State objected because it had not received this tape during discovery and that there was no way to authenticate the tape. The defense argued that they did not have to produce impeachment evidence and that F. could identify his voice. The trial judge suggested that nothing was known about the equipment or the circumstances in which the conversation was recorded. The court then found that the recording was inadmissible, and defendant objected.
Later, defense counsel explained that F. had told K. that while in “Cockatrie” with the family, J.T. attempted to steal something out of K.’s purse. Counsel believed it was pills. Counsel explained that the conversation did not mention the specific act, but that the conversation reflected that after the dance they would break ties and would not be together. The State thought it was irrelevant and was an attack on the victim. The court agreed and said it would not allow it. Defendant maintained his objection.
Both the Sixth Amendment of the United States Constitution and Article I, Section 16 of the Louisiana Constitution (1974) guarantee a criminal defendant the right to present a defense. State v. Lewis, 01-1084, p. 6 (La.App. 5 Cir. 3/13/02), 815 So.2d 166, 171, writ denied, 02-1053 (La.11/15/02), 829 So.2d 424. However, this right does not require a trial court to permit the introduction of evidence that is irrelevant or has so little probative value that it is substantially outweighed by other legitimate considerations in the administration of justice. State v. Carter, 96-358, p. 9 (La.App. 5 Cir. 11/26/96), 685 So.2d 346, 351. All relevant evidence necessary to the defense must be presented for a full adjudication. State v. Vigee, 518 So.2d 501, 504 (La.1988).
Relevant evidence is “evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable hoor less probable than it would be without the evidence.” LSA-C.E. art. 401. All relevant evidence is admissible, except as limited by the Code of Evidence and other laws, and all irrelevant evidence is inadmissible. LSA-C.E. art. 402. A trial judge, in deciding the issue of relevancy, must determine whether the evidence bears a rational connection to the facts at *814 issue in the case. State v. Chester, 97-2790, p. 17 (La.12/1/98), 724 So.2d 1276, 1287, cert. denied, 528 U.S. 826, 120 S.Ct. 75, 145 L.Ed.2d 64 (1999).
However, “[although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.” See LSA-C.E. art. 403. A trial court’s determination regarding the relevancy and admissibility of evidence should not be overturned on appeal absent a clear abuse of discretion. Lyles, 03-141 at 13, 858 So.2d at 47.
Initially, it is noted that defense counsel failed to proffer the tape recorded conversation that he believed to be relevant and material to his defense. Defense counsel spoke vaguely about the conversation and what he believed it was about. However, the recording itself was not proffered. Thus, the specific contents of the evidence are not available to this Court.
An error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and the substance of the evidence was made known by the court by counsel. LSA-C.E. art. 103. This Court has consistently held that when a defendant does not make known the substance of the excluded evidence for the purpose of consideration by the trial and appellate court, the alleged error is not preserved for review on appeal. State v. Massey, 11-358 (La.App. 5 Cir. 3/27/12), 97 So.3d 13, 28.
12i In the present case, defendant has not shown that the trial court’s exclusion of the alleged recording has affected a substantial right because he has made no showing of how the excluded evidence was relevant and material to the defense. Even if the contents of the conversation are consistent with what defense counsel claims, it is difficult to see how F. supposedly wanting to cut ties between the friends because of an incident that was supposed to have happened is related to this case, where J.T. is claiming defendant touched her inappropriately. Even if at one point the parents believed that J.T. was a “bad influence” on their daughter, as suggested by the defense, we fail to find that this is relevant to this case. The record does not contain a proffer made by the defense regarding the specific contents of the excluded evidence or the reasons for its admissibility other than for purposes of impeachment of F., who was not even a victim in this case. The evidence the defense sought to present lacks probative value to this case. Under the circumstances presented here, we find no abuse of the trial court’s discretion in ruling the evidence inadmissible.
In a supplemental assignment of error, defense counsel refers to the denial of the motion for new trial. This is followed by the one sentence argument that “Counsel wishes to adopt the previously submitted additionally applicable for the Supplemental Assignment of Error submitted.” He adds the following conclusion” “In order to be fully complete this Supplemental Assignment of Error is wished to be included in the Appeal of Craig Lirette.”
Under Rule 2-12.4 of the Uniform Rules, Courts of Appeal, all specifications or assignments of error must be briefed, and the appellate court may consider as abandoned any specification or assignment of error that has not been briefed. State v. Tranchant, 10-459, p. 9 (La.App. 5 Cir. 11/23/10), 54 So.3d 730, 735, writ denied, 10-2821 (La.4/29/11), 62 So.3d 108. Restating an assigned 122error in brief without argument or citation of authority does not constitute briefing. State v. Lauff, 06-717, *815 p. 9 (La.App. 5 Cir. 2/13/07), 953 So.2d 813, 819. In State v. Fernandez, 03-987, p. 9 (La.App. 5 Cir. 12/30/03), 864 So.2d 764, 770, this Court found that the defendant failed to brief his position where he merely asserted his position, but failed to include argument or any legal citation in support thereof. The Fernandez court found that the assertions presented nothing for review on appeal.
To the extent that defendant is attempting to add any issue to the original assignments, we find that nothing is presented for review and defendant has abandoned such issue by failing to provide arguments and legal citations.

ERROR PATENT DISCUSSION

The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). The following matter was discovered:
The transcript reflects that defendant was found guilty of the lesser verdict of attempted indecent behavior with a juvenile. However, the commitment suggests that the jury found defendant guilty of the “amended charge” of attempted indecent behavior with a juvenile. Generally, the transcript prevails where there is an inconsistency between the minute entry and the transcript. State v. Lynch, 441 So.2d 732, 734 (La.1983). We find that it is necessary to correct this discrepancy for purposes of accuracy because the commitment suggests that defendant was convicted of an amended charge, instead of a lesser verdict. We therefore direct the district court to make the entries in the commitment reflecting this change and direct the clerk of court to transmit the original of the minute entry to the officer in charge of the institution to which the defendant has been sentenced. See LSA-C.Cr.P. art. 892(B)(2); State ex rel. Roland v. State, 06-0244 (La.9/15/06), 937 So.2d 846 (per curiam). In addition, we order the district court to send the corrected minute entry to the Department of Correction’s Legal Department.

DECREE

For the reasons assigned herein, the conviction and sentence of defendant Craig J. Lirette are hereby affirmed. The case is remanded to the district court for correction of the commitment as set forth herein.

AFFIRMED

.Initials are used in this opinion for the juvenile witnesses and victims involved in this matter under the authority of LSA-R.S. 46:1844(W)(3), which allows the Court to identify a crime victim who is a minor or a victim of a sex offense by using his or her initials. Initials will be used for references to the parents as well to further protect the identity of the juveniles. Because the mother and father share the same initials as two of the juvenile witnesses, the mother and father will be referred to by their first initial only.

. Besides the tapes, transcripts of the interviews were produced at trial as well.

. K. was initially charged in the same bill of information as defendant, but the charges were severed for the purposes of trial.

. K.F. made a similar statement regarding the incident when she was interviewed at the Children's Advocacy Center.

. F.F. was 14 years old at the time she testified at trial.

. F.F. also referred to defendant as Craig.

. F.F. gave a similar statement about the incident when interviewed at the Children’s Advocacy Center.

. She was 14 years old at the time of trial.

. J.T. gave a similar statement about the incident when interviewed at the Children's Advocacy Center.

.She identified defendant in court as C.J.

. The question of sufficiency of evidence is properly raised in the trial court by a motion for post verdict judgment of acquittal. State v. Hooker, 05-251, p. 13 (La.App. 5 Cir. 1/17/06), 921 So.2d 1066, 1074. Although defendant filed a motion for new trial, he did not file a motion for post verdict judgment of acquittal under LSA-C.Cr.P. art. 821. Procedurally, there is a distinction between the two motions. Nonetheless, the failure to file a post verdict judgment of acquittal does not preclude appellate review of the sufficiency of the evidence. State v. Robinson, 04-964, p. 4 (La.App. 5 Cir. 2/15/05), 896 So.2d 1115, 1120 n. 3.

. LSA-R.S. 14:81(H)(2) contains a special sentencing provision when the victim is under the age of 13.