FREDERICKA HOMBERG WICKER, Judge.
12Pefendant appeals his conviction and sentence for second degree murder in violation of La. R.S. 14:30.1. For the following reasons, we affirm.

PROCEDURAL HISTORY

On January 18, 2007, a Jefferson Parish Grand Jury issued an indictment charging defendant, Steve Adams, with the second degree murder of Brandon Spincer in violation of La. R.S. 14:30.1. Defendant was *49 arraigned and entered a plea of not guilty.[1] On December 1, 2009, the matter proceeded to trial and on December 3, 2009, a twelve-person jury found defendant guilty as charged. On December 9, 2009, defendant filed a motion for new trial, which the trial court denied. After defendant waived sentencing delays, the trial court sentenced defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. This timely appeal follows.
| FACTUAL BACKGROUND
Defendant and Ms. Charla Bell had known each other since childhood and had dated for four or five years. Throughout their relationship, the couple broke up and reunited several times, becoming engaged at one point. Each time the relationship ended, defendant took it poorly and became upset. At the time of the victim’s murder, Ms. Bell and defendant were not in a relationship and she had recently moved out of the house she shared with defendant and into an apartment with her cousin, Trelles Stamps. Ms. Bell began dating the victim, Brandon Spincer, in November of 2006.
On the date of the murder, November 20, 2006, Ms. Stamps saw defendant at or near the apartment she shared with Ms. Bell three times prior to the shooting. At one point, defendant came to the apartment with Ms. Bell’s brother, but left after Ms. Stamps informed them that Ms. Bell was not at the apartment. Later, defendant reappeared alone, but Ms. Stamps did not answer the door. That afternoon, Ms. Stamps and her friend, Monisce Hall, were out shopping when Ms. Stamps received a call from defendant, who told her that he wanted to fight for his love. When Ms. Stamps and Ms. Hall returned to the apartment complex sometime between 4:00 and 5:00 p.m., Ms. Stamps noticed defendant driving his white pickup truck down the street adjacent to the apartment complex.
At the time of the murder, Ms. Bell had been dating the victim for a week or two. After the victim finished work that day, he and Ms. Bell ran errands before heading to Ms. Bell’s apartment in the victim’s vehicle, a white Oldsmobile Alero. They arrived in the parking lot and parked behind Ms. Stamps and Ms. Hall, who had arrived minutes before and were parked in Ms. Stamps’ vehicle “chatting.”[2]
|4Ms. Bell exited the victim’s vehicle and approached her friends sitting in Ms. Stamps’ vehicle. She talked to Ms. Stamps and Ms. Hall briefly, then began walking to the front door of her apartment. As she did so, she heard at least four gunshots. She turned to see a white pickup truck, which she recognized as defendant’s, and a man wearing a blonde wig, which she recognized as her own wig left behind when she left the home she had shared with defendant.
Ms. Stamps testified that when she heard the gunshots, she stepped out of her vehicle and saw defendant in a wig firing a *50 gun into the victim’s vehicle. Ms. Hall, the passenger in Ms. Stamps’ vehicle, testified that after she heard the gunshots, she saw Ms. Bell running towards the victim’s vehicle. Ms. Hall then reached her hand out to pull Ms. Bell into Ms. Stamps’ vehicle. When Ms. Bell got into the vehicle, she screamed, “Casper just killed Brandon!”[3] The women sped away in panic, thinking that defendant would follow them.
Ms. Stamps called 911.[4] Before Ms. Bell arrived at the police station,[5] defendant called her and told her that he loved her. Defendant told Ms. Bell that he heard someone was trying to hurt her, so he wanted to make sure she was okay. Later that evening, defendant again called Ms. Bell and she told him to turn himself in to authorities.
At the police station, Ms. Bell, Ms. Stamps, and Ms. Hall each separately identified defendant as the gunman from a photographic lineup. At trial, Ms. Stamps testified that she is one-hundred percent certain that defendant shot the victim. Ms. Bell also testified with certainty that defendant shot the victim. Ms. Hall testified that she did not see defendant shoot the victim; however, she | identified defendant by photographic lineup after the shooting because she heard her friends, who knew defendant well, screaming in the car that defendant had shot the victim.
Mr. Xenophrone Brumfield testified that he was at his girlfriend’s apartment, which is in the same complex where the murder occurred, on the evening of November 20, 2006. Mr. Brumfield is an officer with the HANO Police Department and was in the shower when he heard several noises that sounded like gunshots. He jumped out of the shower and looked out a window to see a black male wearing a white “thigh-high” jacket standing near the rear driver’s side of a white vehicle. Mr. Brumfield put on shorts, grabbed his weapon, and ran outside. He noticed the victim sitting in the driver’s seat of a white vehicle, discovered that the victim was dead, and called 911. Subsequently, Mr. Brumfield identified defendant as the gunman from a photographic lineup.
Mr. Nicholas Chisesi testified that on November 20, 2006, Chisesi Brothers Meat Packing Company employed defendant and that his time card for that day reflected that he reported to work at 6:30 а.m. and clocked out at 8:31 a.m. A notation on the time card indicated that defendant walked off the job that day.[6] Mr. Chisesi also testified that defendant’s work uniform included a white jacket.[7]
On November 21, 2006, the day following the murder, defendant surrendered himself to police. He was advised of his rights, indicated he understood them, and executed a waiver thereof. Defendant gave an initial statement in which he denied any involvement in the murder. A few hours later, defendant gave a second statement in which he admitted that he shot the victim but claimed he did so in self-defense. In his second statement, de *51 fendant stated that he | fiwent to Ms. Bell’s apartment on the evening of November 20, 2006, to try to work things out with her. As he approached the victim’s vehicle, he noticed the victim sitting in the driver’s seat and thought he saw the victim reach for something to point at him. Fearing for his life, defendant shot the victim, drove away, and later threw the gun in Lake Pontchartrain.
At trial, defendant denied shooting the victim and claimed that his confession was coerced. Defendant testified that Jefferson Parish Detective Meunier, “grabbed me, he pulled on me, he pulled the chain [t]hat the handcuffs was on and was forcing me to make a statement telling me that I was going to spend the rest of my life in jail if I don’t give him something.” Defendant also testified that Detective Meunier promised to get defendant a “deal” if he confessed.
Ms. Cheryl Adams, defendant’s mother, testified that she accompanied her son to the detective bureau on November 21, 2006. Ms. Adams waited four or five hours while her son was in a back room with detectives. Officers eventually brought Ms. Adams to the interview room, where she learned that her son had confessed to the murder. Defendant told his mother that the detectives intimidated him and told him he would not see his family again if he did not confess. Ms. Adams testified that defendant appeared “very haggard” and “confused.”
Colonel Timothy Seanlan of the Jefferson Parish Sheriffs Office Crime Laboratory, an expert in the fields of firearms, tool mark analysis, and crime scene reconstruction, testified that two projectile fragments were recovered from the driver’s seat of the victim’s vehicle. Colonel Scan-lan also testified that gunshot residue was present on the victim’s hands, which is indicative of the gunman being in close proximity to the vehicle and victim. However, detectives found no weapons inside the victim’s vehicle and no casings were recovered from the scene.
17Pr. Karen Ross, an assistant coroner in Jefferson Parish and an expert in the field of forensic pathology, performed an autopsy on the victim. Dr. Ross concluded that the victim’s manner of death was homicide and the cause of death was multiple gunshot wounds.[8]

DISCUSSION

In his sole assignment of error, defendant contends that he was denied his right to present a defense on two grounds: (1) the trial court prohibited the cross-examination of Detective Meunier and the introduction of testimony and evidence concerning an alleged false confession taken by Detective Meunier from a suspect in an unrelated criminal case; and (2) the trial court prohibited the cross-examination of Charla Bell concerning conversations she had with defendant after the murder and prohibited defendant from testifying as to one such conversation.

Alleged False Confession

Defendant gave two statements to police. In his first statement, defendant denied any participation in the victim’s murder. In his second statement, defendant confessed to the murder, though he claimed he shot the victim in self-defense. At trial, and now on appeal, defendant asserts that his second statement taken by Detective Meunier was a coerced false confession. In support of this assertion, de *52 fendant sought to introduce evidence of an unrelated criminal case in which he alleges Detective Meunier, through physical force and coercion, obtained a false confession from the suspect.
Prior to trial, the state urged a motion in limine to exclude any evidence of the alleged false confession taken by Detective Meunier in the unrelated criminal case. The trial court granted the state’s motion, finding the evidence and testimony Isinadmissible under La. C.E. art. 608(B). Defendant asserts that the trial judge abused his discretion in excluding the evidence.
Defendant sought to admit evidence of the alleged false confession taken by Detective Meunier in the unrelated criminal case for two reasons: (1) to impeach Detective Meunier’s credibility and (2) to prove that Detective Meunier had the habit, custom, or routine practice of eliciting false confessions from suspects through force or coercion and that he acted consistently with that habit or practice when he elicited defendant’s confession. We will address each theory in turn.
To preserve for appellate review an alleged error in a trial court’s ruling excluding evidence, counsel must make known to the trial court the nature and substance of the excluded evidence. “This can be effected by proffer, either in the form of a complete record of the excluded testimony or a statement describing what the party expects to establish by the excluded evidence.” State v. Magee, 11-0574 (La.9/28/12), 103 So.3d 285, 326.
At trial, defense counsel cross-examined Detective Meunier as follows:
Q: Now, the term false confession, that is a term we heard, correct?
A: Yes.
Q: What is a false confession?
A: A false confession would be an admission of guilt for which the person making the admission is not actually responsible; not responsible for that offense.
Q: That happens, doesn’t it?
A: I believe that happens.
Q: It happened to you, didn’t it?
A: It never happened to me.
MR. SCHLEGEL:
Objection, Your Honor.
THE COURT:
Sustained.
[[Image here]]
At the conclusion of trial, defense counsel made the following proffer:
RYour Honor, it was my intention to cross examine Detective Meunier regarding the issue of this being a false confession and the — what I expected to get and illicit [sic] from Detective Meu-nier was regarding a case that he was the lead detective on State of Louisiana versus Christopher Lindsey and Cedric Evans, which was case number-054600. In that case Christopher Lindsey was arrested and interrogated and gave either two—
[[Image here]]
He gave two statements, the first of which was exculpatory. The second one which was given about four hours later at 4:43 a.m. was inculpatory in that it put him at the scene of a murder where there were only two people involved and they clearly would have been principals based upon the rest of the testimony. Subsequent to that statement he was indited [sic]. Four and half years later DNA test results come back which confirmed that he could not have committed the crime, was not on the scene, as there was DNA found in the fingernails which matched the subject which had not yet been arrested. So clearly the statement *53 that was given at 4:43 a.m. to Detective Meunier was a false confession. Now I had planned to call Christopher Lindsey as a witness to ask him exactly what Detective Meunier had done to him and his testimony would have been similar to that of Mr. Adams in that he was intimidated, he was physically abused and he gave in and gave a statement as a result of what Detective Meunier did to him. And I felt that that would have been evidence to directly impeach Meunier’s testimony that he didn’t force, threat or coerce anyone. And it would have been a direct contradiction to Meunier saying he’d never been involved in a false confession.
* * *
Defendant contends that the trial court’s ruling, limiting the cross-examination of Detective Meunier regarding the Lindsey case and preventing the introduction of testimony from that suspect, Christopher Lindsey, denied him of his constitutional right to present a defense.
Both the Sixth Amendment of the United States Constitution and Article I, Section 16 of the Louisiana Constitution guarantee a criminal defendant the right to present a defense. State v. Lirette, 11-1167 (La.App. 5 Cir. 6/28/12), 102 So.3d 801, 813. However, this right does not require a trial court to permit the | ^introduction of evidence that is inadmissible, irrelevant, or has so little probative value that it is substantially outweighed by other legitimate considerations in the administration of justice. Id. The trial court is accorded great discretion in evi-dentiary rulings and, absent a clear abuse of that discretion, rulings on admissibility of evidence will not be disturbed on appeal. State v. Magee, 11-0574 (La.9/28/12), 103 So.3d 285, 321.
La. C.E. art. 607(A) provides that the credibility of a witness may be attacked by any party, including the party calling him. La. C.E. art. 607(D) further provides that “extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness’ testimony, is admissible when offered solely to attack the credibility of a witness[.]” The admissibility of extrinsic evidence to impeach credibility of a witness however is subject to the relevancy balancing test of La. C.E. art. 607(D)(2), which requires the court to determine whether “the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.” La. C.E. art. 607(D)(2); State v. Juniors, 03-2425 (La.6/29/05), 915 So.2d 291, 330; State v. Cousin, 96-2973 (La.4/14/98), 710 So.2d 1065, 1069-72. Therefore, although La. C.E. art. 607(D) permits a party to attack the credibility of a witness through extrinsic evidence, this grant is necessarily subject to the relevancy balancing test of La. C.E. art. 607(D)(2) and further to the limitation set forth in La. C.E. art. 608(B), which provides:
Particular acts, vices, or courses of conduct of a witness may not be inquired into or proved by extrinsic evidence for the purpose of attacking his character for truthfulness, other than conviction of crime as provided in Articles 609 and 609.1 or as constitutionally required.
Here, the defense sought to impeach Detective Meunier by introducing evidence of the detective’s interrogation of a suspect in an unrelated criminal case. InThe allegation that Detective Meunier obtained a false confession in a separate case does not involve a criminal conviction but concerns an alleged particular act or course of conduct, which La. C.E. art. 608(B) expressly prohibits. See State v. Hollins, 97-627 (La.App. 5 Cir. 11/25/97), 704 So.2d 307, 309, *54 writ denied, 99-0507 (La.8/25/99), 747 So.2d 50. Accordingly, the trial court did not err in excluding, under La. C.E. arts. 608 and 609.1, any testimony or evidence concerning the alleged false confession in the Lindsey case.
Further, we find that, even if the evidence could be relevant to attack Detective Meunier’s credibility for impeachment purposes under La. C.E. art. 607(D), the prejudicial impact and other considerations would greatly outweigh the probative value of the evidence. Examination of Detective Meunier, Mr. Lindsey, and potentially other witnesses in addition to the admission of evidence regarding the circumstances surrounding the alleged false confession in the Lindsey ease would likely consume significant time at trial. Further, such testimony and evidence would require the jury to first determine whether Detective Meunier actually elicited a false confession in the Lindsey case,[9] thereby potentially confusing the jury as to the issues presented at trial. Thus, we find the trial court did not abuse its discretion in excluding the evidence under La. C.E. art. 607.
Defendant also sought to admit evidence of the alleged prior false confession to prove that Detective Meunier had the habit, custom, or routine practice of eliciting false confessions from suspects through coercion and that he acted | ^consistently with that habit or practice in eliciting a false confession from defendant.
La. C.E. art. 406 provides that “[ejvidence of the habit of a person ... is relevant to prove that the conduct of the person ... on a particular occasion was in conformity with the habit or routine practice.” Therefore, evidence that demonstrates an individual’s habit or routine practice may be deemed relevant to prove an individual acted in conformance with that habit. State v. Stringer, 06-800 (La.App. 3 Cir. 12/6/06), 949 So.2d 464, 478. “A habit or routine practice is very specific and must be nearly invariable and semiautomatic.” Id. citing State v. Flowers, 574 So.2d 448, 452 (La.App. 2 Cir. 1/23/91). “When the evidence of a habit consists of ‘specific instances of conduct,’ the instances must be ‘sufficient in number to warrant a finding that the habit existed or that the practice was routine.’ ” State v. Martin, 582 So.2d 306, 315 (La.App. 1 Cir. 5/16/91), writ denied, 588 So.2d 113 (La.1991), citing La. C.E. art. 406.
We find that, even if defendant could prove that Detective Meunier obtained a false confession in the unrelated Lindsey case, that singular occurrence is not sufficient to prove that Detective Meunier has a habit or routine practice of eliciting false confessions from suspects through coercion. Accordingly, we find the trial court did not abuse its discretion in excluding the evidence and that exclusion of the evidence did not deprive defendant of his right to present a defense. This assignment is without merit.

Conversations with Charla Bell

Defendant argues that he was denied his right to present a defense when the trial court prohibited the cross-examination of *55 Ms. Bell concerning conversations she had with defendant following the murder. Further, defendant asserts that the | istrial court improperly prohibited defendant from testifying as to conversations he had with Ms. Bell following the murder.
Regarding defendant’s claim that the trial court limited the cross-examination of Ms. Bell, the record belies defendant’s assertion. A review of the record confirms that defense counsel did in fact cross-examine Ms. Bell about conversations she had with defendant immediately after the shooting:
Q: Now, you indicated that after this shooting occurred that you had a telephone conversation with Mr. Adams?
A: Uh-huh.
Q: You indicated to this jury that Mr. Adams, it is your testimony, that he shot and killed Brandon Spincer?
A: Yes.
Q: You spoke with him on the phone after this happened?
A: Yes.
Q: You spoke with him on many occasions after this happened, isn’t that true?
A: Yes.
Q: You could have hung up on him. You could have called the police. You could have done anything, but you chose to speak with him, isn’t that true?
A: Initially, I was hanging up on him. Right after the incident the detective wanted me to talk to him, so that they could try to get a confession or something out of him.
Q: The cell phone?
A: Yes.
Q: You say that they [sic] were phone calls that were made from Steven to you that were on your cell phone?
A: Uh-huh.
Q: Did you turn that cell phone over to the police?
A: No, I didn’t turn the cell phone over to the police.
Q: Did you tell the police in your statement that they could listen to the messages that he gave you?
A: Yes.
Q: That would prove that he did this and he was out to get you?
A: Yes.
Q: You turned that over to the police?
A: I told them about it.
Q: Did you turned [sic] your phone over to the police?
A: It was a home phone number, so I couldn’t turn my home phone number over. But I gave them access to go and check my voicemails.
Q: Did you tell Detective Rodrigue that you can check my voicemail; I got like 14 messages?
A: Yes.
Q: Voicemail to where your cell phone or?
A: My home phone.
luQ: You gave that information to the police?
A: Yes.
Defense counsel also cross-examined Ms. Bell regarding phone calls she received from defendant while he was incarcerated awaiting trial in this matter:
Q: Isn’t it true, Miss Bell, that after Steven was arrested you called his number?
A: No.
Q: You called his mother at his house on several occasions?
A: No.
Q: Never called her at all?
A: No.
Q: Trying to get in touch with him?
*56 A: His mama and I don’t even get along, so, no.
Q: Isn’t it true take [sic] after he was in jail under arrest being held, that you continued to call him and spoke with him over the phone, clearly, hundreds of times from wherever you were?
A: I wouldn’t be able to call him because he was incarcerated. So the phone calls that were made were phone calls made towards me.
Q: Okay. You answered these phone calls?
A: In the beginning, no, but after awhile, yes.
Q: You spoke to him?
A: Yes.
Q: The person that you claim killed Brandon Spincer?
A: Yes.
Q: You spoke to him regularly, correct?
A: Yes.
Q: You didn’t want to come to court and testify, correct? You lived out of town?
A: Correct.
Q: You have conversations with him over the phone, many different places, many different times, correct?
A: Correct.
Q: Part of the conversations, is it not true, Miss Bell, is that you told him you weren’t going to come to court because this was all a big misunderstanding? Isn’t that true?
A: That is not true.
Q: Isn’t that true that you said, you know that he didn’t do it and that you were not going to come to court, and as a matter of fact you didn’t come to court until you were placed in jail and released?
A: As a matter of fact that is not true. I never said it to Steven anything dealing with the case. The conversations that we had were strictly based on our relationship, not on me coming to court or not. And the reason why I decided to come to court is because Brandon’s family deserves closure.
Contrary to defendant’s assertion, defense counsel was permitted to cross-examine Ms. Bell regarding conversations she had with defendant after the murder. 11fiTherefore, this argument is without merit.
Defendant also argues that he was denied his right to present a defense when the trial court prohibited him from answering questions concerning conversations that he had with Ms. Bell about the shooting. During the direct examination of defendant, the following occurred:
Q: Okay. Did you have a conversation with [Charla Bell] regarding what happened that night?
A: Yes, I did.
Q: And what did she tell you?
MR. SCHLEGEL:
Objection, hearsay.
THE COURT:
Sustained.
MR. WILLIAMS:
Your Honor, note my objection. That is for impeachment purposes of her testimony.
At the conclusion of trial, defense counsel proffered the following:
And while we’re proffering I’d like to proffer that when Mr. Adams testified he was about to go into the conversations he had with Charla Bell I believe that what he was going to say which was that she told him that she would never testify against him, that she knew that he didn’t do it, but she felt like she was *57 under pressure and that she would be in trouble if she came back. And I felt like that deprived him of a right to present a defense. Number-2, it directly contradicted what Ms. Bell said.
Defense counsel sought to introduce defendant’s testimony regarding what Ms. Bell told him after the murder to impeach Ms. Bell’s trial testimony that she agreed to testify because she knew defendant had committed the murder. The trial court excluded this evidence as inadmissible hearsay. A trial court’s ruling on the admissibility of evidence is reviewed for an abuse of discretion. State v. Wright, 11-0141 (La.12/6/11), 79 So.3d 309, 316.
Hearsay is a statement made out of court offered as evidence in court to prove the truth of the matter asserted by the statement. State v. Everidge, 96-2665 (La.12/2/97), 702 So.2d 680, 685 (citations omitted). Hearsay is excluded because hfithe value of the statement rests on the credibility of the out-of-court asserter who is not subject to cross-examination and other safeguards of reliability. Id. In order to fall within the definition of hearsay, the statement must be offered to prove the truth of the statement’s contents. Id. In the present case, Ms. Bell’s out-of-court statement was that she knew defendant didn’t commit the murder. As defense counsel stated in his objection to the trial court’s ruling, this evidence was offered not for the truth of the matter asserted, but for impeachment purposes since Ms. Bell had testified at trial that defendant did commit the murder. Therefore, such testimony is not hearsay evidence offered for the truth of the matter asserted; rather, the testimony was offered to impeach Ms. Bell’s trial testimony that defendant did murder the victim.
The Louisiana Supreme Court has recognized that La. C.E. art. 607(D)(2) permits the introduction of a prior inconsistent statement, even though it is inadmissible hearsay, for the limited purpose of attacking the credibility of a witness. State v. Cousin, 96-2973 (La.4/14/98), 710 So.2d 1065. Thus, even if this evidence constituted inadmissible hearsay, we find it nevertheless admissible for impeachment purposes. Accordingly, we find the trial court abused its discretion in prohibiting defendant’s testimony regarding conversations he had with Ms. Bell after the shooting that would directly contradict Ms. Bell’s trial testimony.
However, we find the trial court’s error to be harmless in this case. Everidge, 702 So.2d at 684-86. Harmless error occurs where the guilty verdict actually rendered was surely unattributable to the error. Id. The evidence presented against defendant at trial was overwhelming. Ms. Stamps, who identified defendant in a photographic lineup as the gunman, testified at trial that she recognized defendant’s vehicle at or near the apartment complex on the day of the murder and also had received a phone call from defendant that day during which 117he told her he wanted to fight for his love; Mr. Brumfield, the neighbor-witness, identified defendant by photographic lineup as the gunman and defendant’s work uniform was consistent with Mr. Brum-field’s description of the gunman’s clothing. The 911 recordings played for the jury and introduced into evidence at trial speak volumes and clearly implicate defendant in the crime.
The correct inquiry for the appellate court to determine whether an error is harmless is whether, assuming that the damaging potential of the testimony were fully realized, the error was harmless beyond a reasonable doubt. State v. Massey, 11-358 (La.App. 5 Cir. 3/27/12), 97 So.3d 13, 29, writ denied, 12-0993 (La.9/21/12), 98 So.3d 332; State v. Sherman, 630 So.2d *58 321, 324 (La.App. 5 Cir.1993), writ denied, 94-0258 (La.5/6/94), 637 So.2d 1086.
We find that even if defendant had been permitted to testify as to Ms. Bell’s prior statement to him that she knew defendant had not committed the murder, the evidence at trial was still sufficient to convince a rational trier of fact that defendant was guilty beyond a reasonable doubt. Accordingly, we find the trial court’s error to be harmless in this case and does not warrant reversal.

ERRORS PATENT REVIEW

The record was reviewed for errors patent, according to La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990).
A review of the sentencing transcript reveals that the trial court failed to indicate whether defendant’s sentence is to be served at “hard labor.” La.C.Cr.P. art. 879 requires a court to impose a determinate sentence. State v. Horton, 09-250, p. 11 (La.App. 5 Cir. 10/27/09), 28 So.3d 370, 376. If the applicable sentencing statute allows discretion, the failure to indicate whether the sentence is to be served at “hard labor” is an impermissible, indeterminate sentence. Id. at 376-77 (citation | isqmitted). The trial court imposed defendant’s sentence pursuant to La. R.S. 14:30.1(B), which mandates the sentence to be at hard labor. Because the underlying statute, La. R.S. 14:30.1(B), required the sentence be served at hard labor allowing no discretion to the trial judge, the error was harmless and requires no corrective action. State v. Stewart, 10-389 (La.App. 5 Cir. 5/10/11), 65 So.3d 771, 783-84, writ denied, 11-1245 (La.1/20/12), 78 So.3d 140.

AFFIRMED

. On January 19, 2007, defendant was arraigned and pled not guilty. On January 17, 2008, defendant entered a plea of not guilty by reason of insanity. A competency hearing was conducted during which both the state and defense stipulated to the sanity commission report and the trial court found defendant incompetent to stand trial. Subsequently, on July 15, 2009, a competency hearing was again conducted during which the state and defense stipulated to the sanity commission report and the trial court found defendant competent to stand trial. On October 15, 2009, defendant withdrew his plea of not guilty by reason of insanity and entered a plea of not guilty.

. Ms. Stamps’ daughter and Ms. Hall’s son were also in the backseat of Ms. Stamps’ vehicle. •

. The record reflects that defendant’s nickname is Casper.

. The 911 recording, which demonstrates apparent panic in the vehicle and clearly implicates defendant in the murder, was played for the jury.

. The women drove to a relative’s home, a friend's home, and an Orleans Parish police station before eventually each arriving to a police station in Jefferson Parish, where the murder occurred.

. At trial, defendant testified that he walked off the job to check on his grandmother, who he claimed was sick at the time.

.At trial, defendant denied walking off the job with his white work jacket.

. Dr. Ross testified that the victim suffered from gunshot wounds to his left cheek, the left side of his chest, his left elbow, and his back. Dr. Ross opined that the wound sustained to the victim's cheek appeared to be the initial one since it exhibited atypical qualities consistent with shattered glass striking the victim's face along with the projectile.

. The evidence offered in support of defendant’s claim that Mr. Lindsey gave a false confession consists of Mr. Lindsey’s exculpatory statement, defendant’s assertion that Mr. Lindsey gave an inculpatory statement, and a minute entry which counsel suggests reflects that the charges against Mr. Lindsey were dismissed. Defense counsel did not proffer Mr. Lindsey's alleged inculpatory statement. Further, the minute entry preferred in the trial court is not contained in the record on appeal. This Court provided defense counsel with the opportunity to supplement the record with this minute entry and he failed to do so. However, as discussed above, even if the evidence proffered reflects what defendant claims, we still find the evidence properly excluded.