STATE OF LOUISIANA

VERSUS

ANTHONY L. LANE

NO. 20-KA-181

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA


ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 17-5760, DIVISION "J"
HONORABLE STEPHEN C. GREFER, JUDGE PRESIDING


January 27, 2021


**MARC E. JOHNSON**
**JUDGE**


Panel composed of Judges Susan M. Chehardy,
Marc E. Johnson, and John J. Molaison, Jr.


**CONVICTIONS AND SENTENCES AFFIRMED;**
**REMANDED WITH INSTRUCTIONS TO CORRECT UNIFORM**
**COMMITMENT ORDER (UCO) AND APRIL 16, 2020 MINUTE ENTRY**

    **MEJ**

    **SMC**

    **JJM**

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
    Honorable Paul D. Connick, Jr.
    Thomas J. Butler
    Gail D. Schlosser
    Laura S. Schneidau

COUNSEL FOR DEFENDANT/APPELLANT,
ANTHONY L. LANE
    Prentice L. White

**JOHNSON, J.**

Defendant, A.L., seeks review of the Twenty-Fourth Judicial District Court's judgment finding Defendant guilty of two counts of indecent behavior with a juvenile in violation of La. R.S. 14:81.[1] Defendant was sentenced to six years with the Department of Corrections at hard labor for each count, to be served consecutively. Defendant was also required to register as a sex offender pursuant to La. R.S. 15:544. Defendant alleges that the evidence presented by the State during the two-day trial was insufficient to support his convictions. For the following reasons, we affirm the trial court's ruling.

*FACTS AND PROCEDURAL HISTORY*

On November 3, 2017, a bill of information charging Defendant with one count of indecent behavior with a juvenile, "Beth" (D.O.B. 10/29/1999), in violation of La. R.S. 14:81. Defendant pled not guilty at his arraignment four days later. The State filed a superseding bill of information on July 13, 2018, charging Defendant with two counts of indecent behavior with a juvenile (D.O.B. 10/29/1999 and D.O.B. 11/22/1998) in violation of La. R.S. 14:81. Defendant pled not guilty at his second arraignment on December 8, 2018.

Trial commenced on February 10, 2020, and a six-person jury unanimously found Defendant guilty the next day. Defendant's Motion to Suppress Statement was denied on February 20, 2020. Defendant's motions for new trial and for post-verdict judgment of acquittal were also denied, and on March 16, 2020, Defendant was sentenced to six years imprisonment at hard labor for each count of indecent behavior with a juvenile, to be served consecutively, after waiving sentencing delays. The trial court also advised Defendant of his obligation to register as a sex

---

[1] Pursuant to La. R.S. 46:1844(W)(3), we will refer to Defendant in the case by his initials and use pseudonyms to identify the victims and their family members. *State v. Gibson*, 09-486 (La. App. 5 Cir. 3/9/10); 38 So.3d 373, 375, *writ denied*, 10-802 (La. 11/5/10); 50 So.3d 814; *see also State v. Myles*, 04-677 (La. App. 5 Cir. 1/25/05); 894 So.2d 515, 528.

offender and provided Defendant with a written copy of the sex offender notification requirements. Defendant's timely motion for appeal was granted on March 30, 2020, but his motion to reconsider sentence was denied on April 23, 2020.

At trial, "Mary", the victims' aunt, testified that she and her nieces, with whom she visited weekly, enjoyed a close relationship. However, "Anne" secretly joined the military after her high school graduation. "Mary" was "very shocked" by the decision because "Anne" had been accepted to L.S.U. "Mary" recalled that "Beth" visited her at work on September 5, 2017, and the pair sat and talked in "Mary"'s car. During that conversation, "Beth" explained to "Mary" why her sister "Anne" joined the military. "Mary" recalled that "Beth"'s demeanor changed and "Beth" started to cry as she told her aunt that "Anne" was running away from Defendant, their father. "Beth" was 17 years old when she disclosed to her aunt that she and her sister had been abused. "Beth" asked "Mary" to keep the information a secret. Later, "Beth" gave "Mary" permission to tell "Nancy", "Mary"'s sister and the girls' mother, about their conversation. "Mary" went to "Nancy"'s job to tell her about her visit with "Beth" and then the sisters went to "Nancy"'s house in Metairie, where "Mary" called 911 to inform the police. The State offered, filed, introduced and published the 911 call before playing the video tape in open court.

"Mary" described "Anne" and "Beth" as "good girls" who listen to their parents and "don't cause them no problems" or get into trouble. "Mary" did not know about any marital problems between her sister and Defendant or an incident in 2015 where the police were called out to the home. Defendant and "Mary"'s sister "Nancy" had dated since "Mary" was 15 years old. According to "Mary", Defendant was not a normal, doting father; "he was just there." She never saw Defendant do anything inappropriate, and the girls loved their father. Her nieces

were not allowed to date or have boys over to the home. Although "Mary" read text messages between "Beth" and "Anne", she did not see the text messages between "Anne" and Defendant, but testified "["Beth"] told [her] that "Anne" didn't go to college because [Defendant] texted "Anne" and said ['] I don't care where you gone, I'm always going to find you['] and that's why ["Anne"] joined the Army and left." After Defendant went to jail, "Nancy" moved into "Mary"'s home.

"Nancy", Defendant's wife and the victim's mother, confirmed that her sister "Mary" visited her at work and informed her of her younger daughter's disclosure on September 6, 2017. She and Defendant had been married for fifteen or sixteen years. "Nancy" explained that the family had lived in the apartment on Populus[2] since 2012. She and Defendant were separated at times while living on Populus, and Defendant was not always in the home. The family also lived on May, at one point, and stayed with family whenever they were evicted. The only time "Anne" had her own room was the first time the family lived on Populus. When "Anne" and "Beth" were around nine or ten years old, the family stayed on Hedera. "Nancy" described her daughters as "wonderful kids" and sweet, and added that "Anne" is "strong like me."

In 2017, "Nancy" worked at a day care and a chemical plant and also went to school full-time. She left the home at 2:15 a.m. in the morning and Defendant would be responsible for the children. On September 6, 2017, "Mary" went to "Nancy"'s job and told her that they had to go home because something happened. "Nancy" spoke to "Beth" at the house and "Nancy" recalled that "Beth" had tears in her eyes and was crying. "Nancy" testified that "Beth" said that "her dad had been touching her. Her dad had been coming in her room and touching her." "Nancy" agreed with the decision to call the police. When the police arrived, they

---

[2] All street names of the victims' addresses have been changed to protect their privacy. *See* note 1, *supra*.

spoke to "Beth" privately. "Anne" had been gone for approximately three weeks before her sister's disclosure. "Nancy"'s efforts to find "Anne" were unsuccessful but she suspected "Anne" went to the military because she had found a packing list in her laundry. "Nancy" remembered that "Anne" was in ROTC in school, but stated that it was not "Anne"'s lifelong dream to enter the military. Before "Anne" left, "Nancy" felt that the girls had become a little withdrawn. "Anne" refused to give her father a ride to work once and "Beth" was very quiet and had a crying spell approximately a month before the disclosure was made. "Nancy" gave "Anne"'s phone to the police in April 2018 in hopes that it would contain evidence of communications between Defendant and the victims. "Nancy" testified that she did not know a lot about phones, but her husband fixed and repaired phones if any family member's phone broke or was not working properly.

"Nancy" explained that her whole family saw her children a lot but she did not share details about the state of her marriage because she is a private person and her sister "talks too much." Defendant drank and worked at a club when the girls were eleven and twelve years old. "Nancy" admitted that she and Defendant argued a lot, and "Anne" got in the middle of a physical fight between them once. The girls were not allowed to date or entertain boys in the home. "Nancy" also testified that the girls had jobs and paid their own phone bills. "Nancy" never learned specific details about the abuse. She asked her daughters about the disclosures, but respected their privacy when they chose not to respond.

Detective Kerstin (Mcabee) Henderson began her career in law enforcement in 2007. In 2017, she worked in the personal violence unit of Jefferson Parish Sheriff's Office (JPSO). She responded to the call at 2535 Populus on September 6, 2017. Det. Henderson recalled that "Beth" was shy and not forthcoming, but "Beth" was able to describe past incidents that Det. Henderson discerned were criminal in nature. "Beth" was 17 years old at the time of the initial interview,

which she recorded. "Beth" told her that the abuse began around sixth or seventh grade and the last incident was around ninth grade. "Beth" told the detective that she did not witness abuse of any other victims, but she did talk to her sister, "Anne" about the abuse. "Beth" told Det. Henderson that the abuse took place at 2535 Populus and also on May Avenue, a previous residence.

Det. Henderson also interviewed "Beth"'s aunt and mother. "Beth"'s aunt, "Mary", confirmed the circumstances of the initial disclosure. "Beth"'s mother, "Nancy", told Det. Henderson that she did not have prior knowledge of the abuse, but she did recall an earlier incident where her older daughter "Anne" ran out of the house because she was upset about something that happened inside. Det. Henderson testified that there were no child custody issues in the home at the time the disclosure was made.

After speaking with "Beth" and her aunt and mother, Det. Henderson met with Defendant at the JPSO Criminal Investigations Bureau. The entirety of her contact and conversation with Defendant was recorded. A redacted version of the video, that the State and the defense stipulated to as including all relevant portions of Defendant's statement, was played in open court. Det. Henderson testified that she advised Defendant of his Miranda rights. The form she used to assist her with advising Defendant of his rights was also admitted into the record as evidence. After taking Defendant's statement, Det. Henderson applied for an arrest warrant charging Defendant with sexual battery and indecent behavior with a juvenile. "Beth" was the only victim at the time; Det. Henderson had not made contact with "Anne", who lived out-of-state, at that time.

Det. Henderson also interviewed the girls' younger sister who did not make any disclosure but informed the detective that "Anne" asked her, before she left, if her father ever did anything to her. Det. Henderson eventually made contact with "Anne" after continuous attempts, but "Anne"'s mother had provided her with

"Anne"'s cell phone in the meantime. "Beth", and later "Anne", told Det. Henderson about inappropriate text message conversations between "Anne" and Defendant. Det. Henderson made arrangements for "Anne" to be interviewed by the Killeen (TX) Police Department and for the interview to be recorded. Det. Henderson subsequently received a written statement and a video/audio recorded statement. After reviewing "Anne"'s written and video statements, Det. Henderson obtained a second arrest warrant for sexual battery and indecent behavior with a juvenile on May 30, 2018.

Det. Henderson testified that, through those statements, "Anne" disclosed incidents of abuse began when she was in fourth grade and continued until she was 17 years old. "Anne" disclosed that her father touched her on her vagina and exposed himself to her. Det. Henderson was unable to interview Defendant a second time before he was released. Det. Henderson requested a digital forensic search of "Anne"'s phone. She received a report from Solomon Burke, a digital forensic examiner. Det. Henderson testified that there was no physical evidence because of the delayed reporting, and that delayed reporting regarding child or juvenile disclosures of sexual abuse was common.

JPSO Sgt. Solomon Burke was the commander of the digital forensics unit. The parties stipulated that Sgt. Burke was an expert in the field of mobile device forensics. Sgt. Burke prepared a JusticeTrax report after attempting to examine "Anne"'s Apple iPhone. Sgt. Burke recalled that he was unable to exam the phone because a factory reset had been performed and an exam would only yield the factory settings on the device and no usable data. Sgt. Burke explained that the phone could be reset from the phone itself, or remotely by sending a signal from iTunes or your cellular service carrier with authorization. Sgt. Burke testified that a factory reset, or wipe, deletes all the information the apps on the phone previously contained. Sgt. Burke said that Photo Vault is an app designed to hide

images by labeling them with a proprietary file extension so the images are hidden unless someone is able to gain access to the app – those images are not stored in the gallery.

"Beth" testified that her birthday was October 29, 1999 and she lived with her mother and sixteen-year-old sister while working and preparing to continue her education.  In September of 2017, "Beth" recalled that she was seventeen years old and a senior at Grace King High School and she worked at a fast food restaurant.  "Beth" recalled that her sister "Anne" called her from the airport to say goodbye and to let her know that she was leaving to join the military.  "Beth" did not tell her mother where her sister was going because she did not want her mother to tell their father where her older sister was.  "Anne" texted "Beth" and described texts that "Anne" received from their father that said that he would try to find "Anne" when she went away to college and that he was in love with "Anne". "Beth" did not remember if she saw the text messages "Anne" described.

"Beth" recalled going to visit her aunt at her job after she spoke to her sister. "Beth"'s Aunt "Mary" began to question her about "Anne" and whether she was in communication with her sister and why "Anne" left "out of the blue."  "Beth" further testified:

> And I was telling her, like, that, like, why -- she was asking why she didn't tell my momma and my daddy. And ["Anne"] and my momma don't really, like, -- they're not that close and they don't communicate. And I was, like, it doesn't matter that she didn't tell my dad because, like, they, like, it's not like, I said it was none of his business that she didn't tell him.  And she was, like, what do you mean? And I was, like, you know, you don't know, like, you don't understand. And she was, like, you know, like, you know, what you mean? And I was, like -- and she was, like, touched? And I was, like, yeah.

"Beth" recalled that her aunt was crying during her disclosure and "Beth" asked her aunt not to say anything because she did not want to "mess up the family." The next day, "Beth" said her aunt told her that she could not keep her disclosure a secret and that she would tell "Beth"'s mother. "Beth" saw her mother at home, at 2535 Populus, after her aunt told her mother about her disclosure. "Beth" said that "Nancy" asked her why "Beth" did not tell her what was happening. "Beth" responded, "Like, it kind of just came out."

"Beth" described the first incident of abuse that took place at the family's apartment on May. She said that her father was sleeping in her little sister's bed because he had gotten into an argument with her mother. She woke up and jumped when she felt what she discovered was her father rubbing her vagina on the outside of her clothes. She said that her father was next to her in the twin bed at that point and he pretended to be asleep. "Beth" went into her mother's room and sat on the bed but did not say anything. She returned to her room and her father was still laying down. "Beth" also recounted another time on May where she was watching TV on the couch with Defendant and her sister "Anne", and Defendant exposed his penis and stared at her.

"Beth" also remembered a time on Populus when she was in the eighth or ninth grade. She had a new pink bed but was waiting on a new mattress. She said that she woke up to Defendant stroking her vagina and trying to put his hand through the leg opening of her panties towards her crotch from the floor where he had been laying down. "Beth" told her sister "Anne" about the incident as she cried the next morning. She also told "Anne" about what happened at their residence on May, and "Anne" confided to her that it happened to "Anne" also. "Beth" also recalled an incident near Halloween where Defendant admitted to spiking her water bottle after she asked him about it because its contents tasted different after she left to shower. "Beth" had seen Defendant "crushing up pills,

like, sleeping pills" earlier that day. "Beth" mentioned that she had taken sleeping pills before "because she had some problems." She thought that her father had spiked her drink with alcohol.

"Beth" testified about another time on Populus where Defendant tried to touch her through a blanket while she was discussing with him why she and "Nancy" were fussing at one another earlier that day. "Beth" confirmed that she and her sister were not allowed to date and that she loved her father, but she did not make the allegations up to get her father out of the house. She said that she would also receive "creepy" text messages from Defendant to turn the TV off and unlock the door, which she would keep locked "because he [would] come into the room."

"Anne"'s birthday was November 22, 1998 and she was 21 years old at the time of the trial. During high school, she worked at Wendy's, Taco Bell, another restaurant, and Walgreens. She used the money she earned to pay her phone bill, car note and insurance. "Anne" testified that joining the military was not her lifelong dream; she wanted to go to college. "Anne" participated in ROTC to avoid taking gym class. "Anne" recalled that, just before graduation, she received text messages from her father, while they were both at home in different rooms, that read that "he was in love with [her] and wherever [she] was going, he was coming with [her]." She deleted that message and subsequent messages Defendant sent as she received them. She took screenshots of the messages, but deleted them "because [she] was embarrassed. It was inappropriate." "Anne" also feared others would discover what was happening. She deleted the screenshots from her iCloud and downloaded then to an app. She did not remember the name of the app but testified that the app was locked and a password had to be used to access the app. She mentioned that she had to block Defendant from her phone, but he had multiple phones and changed numbers frequently. She also said that she received

emails from her father at some point. "Anne" said that around 2:00 or 3:00 in the morning, for months, Defendant would sit in the dark and stare at their bedroom door. She said that if they came out he would ask if they were looking for something, or if they needed him. Defendant said that she and her father never had a close relationship, that he "creep[*sic*] [her] out" and that he did not participate in their school activities. "Anne" observed her father drinking in the past but she had never seen him drunk.

On the stand, "Anne" identified the iPhone 6 she took with her to basic training. She recalled that it did not function reliably before she left home, but by the time she left home the phone had died. "Anne" explained that the iPhone could be reset by factory reset, or by wiping the phone using your iCloud login. She also stated that she was the only person who knew her iCloud password. She tried to get the phone repaired but the vendor was not successful – she did give the repairman her iCloud password, but she could not say whether he was able to perform a factory reset. "Anne" purchased a new phone that same day.

"Anne" also testified that her parents had a lot of arguments, and that she called 911 once and the police came to the house at least once. She said that furniture was broken during fights and holes were punched in the walls. "Anne" mentioned that her parents did not allow them to date or have any friends visit them at home.

"Anne" joined the military the same day she went to speak to the recruiter. She said that the military was "the only way to guarantee that I could be, like independent and not struggle and not have to come back home[.]" She spoke to an area detective some months after joining the military. She testified that the first instance of abuse she remembered occurred when she was in fourth grade at the family's apartment on Hedera in Metairie. "Anne" said that Defendant "caressed her private area" and touched her vagina with his finger while giving her a

piggyback ride up the stairs. "Anne" described laying at the foot of her parents' bed before her mother had to leave for work at the plant around 2:00 or 3:00 a.m. She recalled one time attempting to leave and being told to stay and inching away slowing and getting in the bed with her little sister and "wrapping [her] legs around her so he wouldn't take her."

When "Anne" had her own room on Populus Avenue she would hear someone playing with the door in the middle of the night. She said Defendant would use his nail or a coin to unlock the door, but if she woke up, he would just close the door and leave. "Anne" described setting "booby traps" behind the door so she could remain asleep. "Anne" also would lock her door because Defendant touched them inappropriately. She mentioned Defendant sticking his hands in their shirts and grabbing their breasts while play fighting. She said that this happened at least three times when she and her sister just started wearing bras and before they stopped playing with their father because "it wasn't worth it."

"Anne" testified that the family had been evicted from their home a lot and her parents also separated several times. While living at the apartment on May, "Anne" recalled Defendant faking arguments with their mother so he could sleep in one of their beds. "Beth" asked to sleep in "Anne"'s bed once because Defendant had touched her one night. "Anne" described another incident where her father caressed her vagina but she woke up immediately and he pretended to be asleep. "Anne" testified that the next day her father left money in her drawer for $120 shoes he knew she wanted even though her mother said "no" the day before because all the family had was bill money. "Anne" gave the money to her mom for shoes, but her mother used the money for bills. "Anne" did not tell her mother what was going on after this incident because she was embarrassed and scared. "Anne" said she did tell "Beth" "it happened to me" when "Beth" told her about the abuse she had experienced, but the sisters did not share details. Also, once

while they were at the house on May, "Beth" told "Anne" that Defendant "pulled his private area out" while they were watching TV in the living room. "Anne" told "Beth" to come in their room and lock the door until their mother returned home. "Anne" said that the girls mostly stayed with their grandmother while the family lived on May.

When the family lived on Populus the second time, the sisters kept their door locked all of the time. One night, "Anne" woke up to find her sister "Beth" crying after Defendant crawled into the room and touched "Beth". "Anne" recalled another incident where she observed her naked father in the shower bathing because the bathroom door was wide open. She said that Defendant looked "dead at [her]" before she left the house. She said that her father got dressed and came after her, screaming her name and asking her what she was doing. "Anne" recalled telling him to leave her alone and stop following her. "Anne" waited in the car for 30 minutes, until her mother came back. "Anne" and her sister attempted to tell their mother about this particular incident, but their mother was half-asleep.

After "Anne" testified, the trial judge confirmed that Defendant understood his rights and chose not to testify. The judge then charged the jury with instructions. On March 16, 2020, the court noted that a jury had unanimously convicted A.L. and concluded that the facts and evidence supported his convictions before denying Defendant's post-trial motions (Motion for a New Trial and Motion for Post-Verdict Judgment of Acquittal to challenge sufficiency of the evidence). The State also read a victim impact statement that "Nancy" wrote on behalf of herself and her daughters before the district court sentenced Defendant to six years commitment with the Department of Corrections at hard labor for each count of indecent behavior with a juvenile, to be served consecutively.

Defendant alleges that the evidence presented at trial was insufficient to support his conviction on two counts of indecent behavior with a juvenile in violation of La. R.S. 14:81. Defendant notes that the allegations against him surfaced years after the last alleged incident of abuse took place. Defendant urges the district court committed reversible error when it accepted the jury's guilty verdict, despite there being no physical evidence, eyewitnesses, or prior documentation of the alleged incidents and prays this court set aside his felony convictions.

*LAW AND DISCUSSION*

In reviewing the sufficiency of the evidence, an appellate court must determine if the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Mickel*, 09-953 (La. App. 5 Cir. 5/11/10); 41 So.3d 532, 534, *writ denied*, 10-1357 (La. 1/7/11); 52 So.3d 885; *State v. Ordonez*, 16-619 (La. App. 5 Cir. 3/15/17); 215 So.3d 473, 477. This directive that the evidence be viewed in the light most favorable to the prosecution requires the reviewing court to defer to the actual trier of fact's rational credibility calls, evidence weighing, and inference drawing. *State v. Clifton*, 17-538 (La. App. 5 Cir. 5/23/18); 248 So.3d 691, 702. This deference to the fact-finder does not permit a reviewing court to decide whether it believes a witness or whether the conviction is contrary to the weight of the evidence. *State v. Caffrey*, 08-717 (La. App. 5 Cir. 5/12/09); 15 So.3d 198, 202, *writ denied*, 09-1305 (La. 2/5/10); 27 So.3d 297. Further, a reviewing court errs by substituting its appreciation of the evidence and the credibility of witnesses for

that of the fact-finder and overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. *State v. Alfaro*, 13-39 (La. App. 5 Cir. 10/30/13); 128 So.3d 515, 531, *writ denied*, 13-2793 (La. 5/16/14); 139 So.3d 1024 (citing *State v. Calloway*, 07-2306 (La. 1/21/09); 1 So.3d 417, 418). As a result, under the *Jackson* standard, a review of the record for sufficiency of the evidence does not require the reviewing court to determine whether the evidence at trial established guilt beyond a reasonable doubt but whether, upon review of the whole record, any rational trier of fact would have found guilt beyond a reasonable doubt. *See State v. Jones*, 08-20 (La. App. 5 Cir. 4/15/08); 985 So.2d 234, 240.

In its determination of whether any rational trier of fact would have found the defendant guilty, a reviewing court will not re-evaluate the credibility of witnesses or re-weigh the evidence. *See Caffrey*, *supra*. The resolution of conflicting testimony rests solely with the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. *See State v. Bailey*, 04-85 (La. App. 5 Cir. 5/26/04); 875 So.2d 949, 955, *writ denied*, 04-1605 (La. 11/15/04); 887 So.2d 476, *cert. denied*, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005). Thus, in the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. *State v. Dixon*, 07-915 (La. App. 5 Cir. 3/11/08); 982 So.2d 146, 153, *writ denied*, 08-987 (La. 1/30/09); 999 So.2d 745. The victim's testimony alone can be sufficient to establish the elements of a sexual offense, even when the State does not introduce medical, scientific, or physical evidence to prove the commission of the offense. *State v. Lestrick*, 13-289 (La. App. 5 Cir. 10/9/13); 128 So.3d 421, 430, *writ denied*, 13-2643 (La. 4/25/14); 138 So.3d 643; *see also Dixon*, *supra*

at 153; *see also State v. Bruce*, 14-877 (La. App. 5 Cir. 3/25/15); 169 So.3d 671, 675, *writ denied*, 15-833 (La. 3/4/16); 187 So.3d 1007.

The jury found Defendant guilty of indecent behavior with a juvenile (D.O.B 10/29/1999) in violation of La. R.S. 14:81 (count one) and indecent behavior with a juvenile (D.O.B 11/22/1998) in violation of La. R.S. 14:81 (count two). Indecent behavior with a juvenile is defined, in pertinent part, as:

> A. Indecent behavior with juveniles is the commission of any of the following acts with the intention of arousing or gratifying the sexual desires of either person;
>
> (1) Any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons. Lack of knowledge of the child's age shall not be a defense;

La. R.S. 14:81.

Accordingly, to convict a defendant of indecent behavior with a juvenile under La. R.S. 14:81, the State must prove that (1) there was an age difference of greater than two years between the accused and the victim, who was not yet seventeen; (2) the accused committed a lewd or lascivious act upon the person or in the presence of a child; and (3) that the accused intended to arouse or gratify either his own or the victim's sexual desires. *State v. Battaglia*, 03-692 (La. App. 5 Cir. 11/25/03); 861 So.2d 704, 708, *writ denied*, 04-1701 (La. 4/29/05); 901 So.2d 1058. A lewd or lascivious act has been defined as "one which tends to excite lust and to deprave the moral with respect to sexual relations and which is obscene, indecent, and related to sexual impurity or incontinence carried on in a wanton manner." *State v. Shokr*, 16-337 (La. App. 5 Cir. 2/8/17); 212 So.3d 1212, 1216, *writ denied*, 17-589 (La. 12/15/17); 231 So.3d 638 (citing *State v. Lande*, 06-24 (La. App. 5 Cir. 6/28/06); 934 So.2d 280, 291, *writ denied*, 06-1894 (La. 4/20/07), 954 So.2d 154). Additionally, the statute's definition of a lewd and lascivious act "encompasses not only the

physical touching of the victim in an indecent manner, but also 'indecent sexual displays in the presence of children under the age of seventeen.'" *Id.* (citing *State v. Interiano*, 03-1760 (La. 2/13/04); 868 So.2d 9, 15). In determining whether an act is lewd or lascivious, the trier of fact must consider the time, the place, and all of the circumstances surrounding its commission, including the actual or implied intention of the actor. *State v. Domangue*, 12-760 (La. App. 5 Cir. 5/23/13); 119 So.3d 690, 695 (citing *State v. Sturdivant*, 27,680 (La. App. 2 Cir. 2/28/96); 669 So.2d 654, 659).

Indecent behavior with a juvenile is a specific intent crime for which the State must prove the offender's intent to arouse or gratify his sexual desires by his actions involving a child. *State v. Borden*, 07-396 (La. App. 5 Cir. 5/27/08); 986 So.2d 158, 166, *writ denied*, 08-1528 (La. 3/4/09); 3 So.3d 470. Specific intent to commit indecent behavior with a juvenile need not be proved as fact, but may be inferred from the circumstances and actions of the defendant. *Domangue*, 119 So.3d at 696.

Upon review of the record, we find that the evidence the State presented at trial established each element of the offenses for which Defendant was convicted. "Anne" and "Beth" testified as to acts committed by Defendant that constitute indecent behavior with a juvenile. "Anne" testified regarding separate incidents that occurred at various addresses. First, she testified that when she was in fourth grade and living at the Hedera address, Defendant touched her vagina through her clothes while giving her a "piggyback ride" up the stairs. Next, "Anne" testified that, on at least three different occasions, Defendant touched her inappropriately while they were "play fighting" by putting his hands in her shirt and grabbing her breast at the family's home on Populus. Finally, "Anne" testified that, at the May address when she probably was in seventh grade, Defendant entered her room while she was asleep and "caressed" her

vagina. "Anne" also testified that Defendant once intentionally exposed himself in the shower and stared at her while she was watching television. Defendant then chased after "Anne" and screamed her name after she ran outside.

"Beth" also testified at trial about separate incidents that occurred at the family's various homes. She testified that the abuse began when she was in sixth grade. She shared a bedroom with her sisters at the May address. "Beth" recalled waking up one night to Defendant rubbing the top of her vagina, outside of her clothing. "Beth" described another incident where Defendant exposed his penis and watched her while she was lying on the couch in the living room and they were watching television. "Beth" also testified that, when she was in eighth or ninth grade and the family lived at the Populus address, Defendant "stroked" her vagina while she was asleep and she woke up when Defendant attempted to put his hand in her underwear. "Beth" testified that "Anne" was also asleep in the room when this happened and that she told "Anne" about the incident the next morning.

"Anne" and "Beth" testified that they were born in 1998 and 1999, respectively, and the incidents mostly occurred when they were in grade school and middle school. The bills of information, minute entries, and uniform commitment order show that Defendant was born in 1978. Therefore, the state also established that the victims were under the age of seventeen at the time the incidents took place and Defendant, their father, was more than two years their senior.

As previously discussed, the victim's testimony alone is sufficient to establish the elements of a sexual offense. *See Clifton*, 248 So.3d at 703. "Anne" and "Beth"'s testimony was sufficient to establish Defendant's actions were lewd and lascivious acts. *See Domangue,* 119 So.3d at 696 (finding that defendant's actions constituted a lewd and lascivious act where victim testified

that defendant touched her on her private part, which she described as her "bottom parts," both underneath and on top of her clothing, on five or more occasions); *State v. Bahm*, 490 So.2d 384, 388 (La. App. 5th Cir. 1986) (finding a victim's testimony that the defendant had rubbed her genitals, inserted his finger into her vagina, touched her breasts, and exposed his penis to her fifty to sixty times over a three-year period, and the testimony of the thirteen-year-old victim that the defendant had twice exposed his penis to her, were sufficient to show that the defendant committed lewd and lascivious acts upon the person and/or in the presence of the victims); *State v. Mallette*, 15-1131 (La. App. 3 Cir. 6/8/16); 193 So.3d 603, 632, *writ denied*, 16-1301 (La. 6/16/17); 221 So.3d 837 (finding the defendant's act of touching the victim's vagina over and under her clothing with his hand constituted lewd and lascivious acts).

In addition, the requisite element of specific intent to arouse or gratify the sexual desires of either person may be inferred from the circumstances and the action of the offender. *See State v. Blanchard*, 00-1147 (La. 4/20/01), 786 So.2d 701. Here, the circumstances indicate that Defendant entered "Anne" and "Beth"'s bedroom on separate occasions and then touched their genitals through their clothing as they slept. "Beth" testified that Defendant did this to her on two separate occasions. During one of these incidents, "Beth" woke up because Defendant attempted to put his hand beneath her underwear. "Anne" testified that Defendant touched her vagina with his finger while giving her a "piggyback ride." She also recalled defendant sticking his hands in her shirt and grabbing her breast through her bra on three occasions. Defendant's repeated touching of "Anne" and "Beth" indicate that his actions were not accidental but lewd and lascivious acts performed with the specific intent to arouse or gratify his sexual desires.

We find that the evidence was sufficient for the jury to infer that Defendant intended to arouse his sexual desire by committing these intentional sexual acts. *See State v. Lirette*, 11-1167 (La. App. 5 Cir. 6/28/12); 102 So.3d 801, 811-12, *writ denied,* 12-1694 (La. 2/22/13); 108 So.3d 763. Similarly, in *Lirette*, we found that the defendant had requisite intent to arouse or gratify himself based on the victim's testimony that the defendant woke her up when he was moving her legs, rubbed her, squeezed her "butt," and touched her vagina. Also, in *State v. Lestrick*, 128 So.3d at 435, this Court found that the State proved, beyond a reasonable doubt, the defendant, who inserted (or attempted to insert) his fingers just inside the waistband of one victim and rubbed a second victim's chest and vagina on top of her clothes was guilty of two counts of indecent behavior with a juvenile. The Court found that the defendant's activities of "lying on the bed with two juveniles half his age [and his repeated touching of victims indicated] that his actions were not accidental, but rather were lewd and lascivious acts performed with the specific intent to arouse or gratify his sexual desires."

On appeal, Defendant asserts that "Anne" and "Beth"'s allegations were uncorroborated. He points out that neither victim witnessed the other being abused, although a few of the alleged incidents occurred in a shared bedroom when all three were present. Defendant further asserts that "Anne" and "Beth"'s allegations are unsupported by any physical, scientific, or eyewitness accounts. However, the testimony of a victim need not be corroborated to support a conviction. *See State v. Ordonez*, 215 So.3d, at 478. It is well-settled that a victim's testimony alone can be sufficient to establish the elements of a sexual offense, even when the State does not introduce medical, scientific, or physical evidence to prove the commission of the offense. *Bruce*, *supra*.

Further, "Anne"'s testimony corroborated "Beth"'s testimony and vice versa. Both "Anne" and "Beth" testified that the other was asleep when Defendant touched them in their shared bedroom at the May address. "Anne" testified that around this time, "Beth" asked to sleep in her bed because Defendant had touched her. "Anne" recalled that "Beth" immediately told her that Defendant exposed his penis to her. Also, "Anne" and "Beth" testified that they would move items in front of their door at night to alert them if and when Defendant attempted to enter their bedroom.

The State also presented the testimony of other witnesses whose testimony was consistent with that of the victims. "Nancy" recalled entering "Anne" and "Beth"'s room and finding items blocking their door. "Nancy" also testified that one evening she found "Anne" sitting outside and crying and "Anne" told her that Defendant was "standing there naked." Detective Henderson also testified that "Nancy" told her about this incident with "Anne".

At trial, Defendant's statement was played for the jury, and he denied touching his daughters. In reaching a verdict, the jury made a credibility determination. Again, the trier of fact is free to accept or reject, in whole or in part, the testimony of any witness, and, in this case, the jury accepted the State witnesses' version of events. Further, where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. McClure*, 14-253 (La. App. 5 Cir. 3/11/15); 169 So.3d 510, 522, *writ denied*, 15-684 (La. 2/26/16); 187 So.3d 468. An appellate court's function is not to re-determine the defendant's guilt or innocence based on its appreciation of the facts and credibility of the witnesses. *State v. Hidalgo*, 20-89 (La. App. 5 Cir. 3/18/20); 293 So.3d 780, 785.

In the instant matter, the jury heard all of the testimony, viewed all of the evidence presented at trial, and found Defendant guilty. We find no internal contradiction or irreconcilable conflict within "Anne" and "Beth"'s testimony, or between their testimony and that of the other witnesses. Viewing the evidence in a light most favorable to the State, we find Defendant's assignment of error is without merit, a rational trier of fact could have found Defendant guilty beyond a reasonable doubt of two counts of indecent behavior with a juvenile, and the evidence is sufficient to support Defendant's convictions.

## ERRORS PATENT

The record was reviewed for errors patent, pursuant to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5th Cir. 1990). The following errors were noted.

Trial commenced before a six-person jury on February 10, 2020. On that same date, the State amended the superseding bill of information regarding the dates of the offenses on counts one and two. The State amended the offense date range on count one from on or between January 1, 2012 and December 31, 2016, to on or between January 1, 2012 and October 29, 2016 as to count one. The State amended the offense date range on count two from on or between January 1, 2009 and July 31, 2017, to on or between January 1, 2009 and November 22, 2015. The amendments to the end dates for the windows the abuse occurred were amended to correspond with the victims' seventeenth birthdays. The amendments were done by hand and the amended bill of information was signed and dated "February 10, 2020" by an assistant district attorney. It is unclear from the record whether the indictment was amended before or after the trial began.

The amendment of indictments and bills of information is regulated by La. C.Cr.P. art. 487(A):

An indictment that charges an offense in accordance with the provisions of this Title shall not be invalid or insufficient because of any defect or imperfection in, or omission of, any matter of form only, or because of any miswriting, misspelling, or improper English, or because of the use of any sign, symbol, figure, or abbreviation, or because any similar defect, imperfection, omission, or uncertainty exists therein. The court may at any time cause the indictment to be amended in respect to any such formal defect, imperfection, omission, or uncertainty.

Before the trial begins the court may order an indictment amended with respect to a defect of substance. After the trial begins a mistrial shall be ordered on the ground of a defect of substance.

The date or time of the commission of an offense need not be alleged in the indictment, unless the date or time is essential to the offense. La. C.Cr.P. art. 468. Further, the date and time of the offenses are not essential elements of the offense of indecent behavior with a juvenile. *See Lirette*, 102 So.3d at 811; *State v. Lyles*, 03-141 (La. App. 5 Cir. 9/16/03); 858 So.2d. 35, 44 ("The date and time of the offenses are not essential elements of the offense of indecent behavior with a juvenile [La. R.S. 14:81] and, therefore, a bill of information which does not reflect the date and time of the offense is not insufficient."). A mistake reflecting the date for which the offense occurred has been held to be such a defect of form when not essential to the offense. *State v. Dye*, 384 So.2d 420, 422 (La. 1980); *See State v. Lawson*, 393 So.2d 1260, 1263 (La. 1981). Therefore, we find that the amendment of the date of the violation of La. R.S. 14:81 alleged in the bill of information was a defect as to form, not a defect of substance, and, pursuant to La. C.Cr.P. 487(A), the trial court had the authority to allow the amendment at any time.

We also note that the record does not show that Defendant was re-arraigned after the State amended the superseding bill of information on February 10, 2020. The purpose of an arraignment is to inform the defendant of the substance of the crime he is charged with. La. C.Cr.P. art. 551. A re-arraignment is only required after amendment of a bill of information if the

substance of the charge is changed. *State v. Tillery*, 14-429 (La. App. 5 Cir. 12/16/14); 167 So.3d 15, 23-24, *writ denied*, 15-106 (La. 11/06/15), 180 So.3d 306 (finding that a defendant is not entitled to re-arraignment on an amended indictment when changes to the indictment do not alter the nature of the crime). Again, we find the amendments regarding the dates of the offenses did not alter the substance of the charges against Defendant; so, it was not necessary for Defendant to be re-arraigned. Further, Defendant entered into trial without objecting to proceeding before he was re-arraigned, thereby waiving his objection; Defendant is considered to have pled not guilty. *See* La. C.Cr.P. art. 555.

Also, there are discrepancies between the sentencing minute entries and the transcript in this case. The minute entry dated April 16, 2020 corrected the previous minute entry, which did not reflect the victim impact statement read into the record at sentencing. However, that minute entry does not reflect the offense date ranges as amended by the February 10, 2020 bill of information. *See State v. Daniels*, 18-307 (La. App. 5 Cir. 6/11/19); 275 So.3d 380, 401 (citing *State v. Lyons*, 13-564 (La. App. 5 Cir. 1/31/14); 134 So.3d 36, *writ denied*, 14-0481 (La. 11/7/14); 152 So.3d 170). Also, the Uniform Commitment Order (UCO) does not include the entire offense date range as to counts one and two.

Last, although the record reflects the trial court advised Defendant on the record that he was required to comply with the sex offender notification/registration requirements and provided Defendant with a written copy of those requirements, we note that the Uniform Commitment Order (UCO) does not include as a "Sentence Condition" pre-printed on the form that Defendant shall comply with the Sex Offender Registration statute under the provisions of La. C.Cr.P. art. 895 and La. R.S. 15:541, *et seq*. However, the

advisal is noted in the sentencing minute entry and we will remand the matter for the trial court to correct the UCO.

## *DECREE*

Based on the foregoing, Defendant's convictions and sentences are affirmed. The case is remanded with instructions to the trial court to correct the UCO to include the entire date range of the offenses as to counts one and two and add a sentence condition ordering Defendant to comply with the Sex Offender Registration statute, and also correct the April 16, 2020 minute entry to include the offense date ranges provided by the February 10, 2020 amended bill of information.

**<u>CONVICTIONS AND SENTENCES AFFIRMED;</u>**
**<u>REMANDED WITH INSTRUCTIONS TO CORRECT UNIFORM</u>**
**<u>COMMITMENT ORDER (UCO) AND APRIL 16, 2020 MINUTE ENTRY</u>**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

NANCY F. VEGA
CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **JANUARY 27, 2021** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 20-KA-181

### E-NOTIFIED
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE STEPHEN C. GREFER (DISTRICT JUDGE)
GAIL D. SCHLOSSER (APPELLEE)      THOMAS J. BUTLER (APPELLEE)      PRENTICE L. WHITE (APPELLANT)

### MAILED
HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
LAURA S. SCHNEIDAU (APPELLEE)
ASSISTANT DISTRICT ATTORNEY
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053